Robert K. **LESTER**, Plaintiff,

v.

**UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUND; Paul R. Dean; Joseph P. Connors, Sr.; William B. Jordan; William Miller; and Donald E. PIERCE, Jr., Trustees of the 1974 Pension Trust, Defendants.**

Civil Action No. 298–0725.

United States District Court, S.D. West Virginia, Charleston Division.

Feb. 17, 1999.

Wendle D. Cook, Cook & Cook, Madison, WV, for plaintiff.

Mary Jane Pickers, Shari Collias, Susan Cannon, Ryan–Caldwell, Cannon–Ryan & Riffee, Charleston, WV, Glenda S. Finch, Matilda A. Broadnux, JMWA Health & Retirement Funds, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the Court are cross-motions for summary judgment. Both parties argue that they are entitled to judgment as a matter of law because no genuine issue of material fact exists as to whether the defendants, trustees of the United Mine Workers of America's (UMWA) 1974 Pension Plan (Pension Plan), abused their discretion in denying the plaintiff, Robert Lester, disability benefits under the Pension Plan. The plaintiff suffered a cervical sprain resulting from mine accidents in 1986 and 1987. In 1997, the Social Security Administration found that the plaintiff was disabled, partially due to his cervical sprain. When the plaintiff applied for disability benefits under the Pension Plan, the trustees concluded that the plaintiff's disability was not caused by a mine accident. The defendants hypothesized that the plaintiff was injured in a non-mine-related accident in 1991, and that this accident was the cause of the plaintiff's present disability.

The Court **FINDS** that the defendants improperly discounted the medical evidence in the record when they relied solely on the lapse of time between the plaintiff's mine accident and the Social Security disability determination in concluding that

the plaintiff's disability was not caused by an accident. The mere lapse of time in the face of contradictory medical evidence does not constitute substantial evidence supporting the decision to deny benefits. In addition, it was an abuse of discretion for the defendants to rely on pure speculation in concluding that the plaintiff's disability was caused by a non-mine-related accident. The plaintiff's Motion for Summary Judgment is therefore **GRANTED,** and the defendant's Motion for Summary Judgment is therefore **DENIED.**

## I. Statement of Facts

### A. Pension Plan Provisions

The plaintiff appeals the defendants' decision to deny him disability benefits under the 1974 Pension Plan. The Pension Plan contains the following provision concerning disability benefits:

> A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident . . . shall, upon retirement . . . be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

(Dfts.' Mot. for Summ.J., Ex. B at 5.) The trustees for the plan issued a series of interpretive guidelines called "Questions and Answers" ("Q. & A.") to assist in the uniform application of the plan's provisions. Q. & A. number 252 states that "miners who become disabled by progressive diseases or conditions such as black lung, silicosis, tuberculosis, arthritis, rheumatism, etc. cannot be considered disabled as the result of a mine accident." (Dfts.' Mot. for Summ.J., Ex. C at 2.) The same Q. & A. further states that "[m]iners who become disabled under the circumstances described in the following examples can be considered 'disabled as a result of a mine accident'. . . ." *Id.* at 1. The list of examples that follows includes, "a miner bumps his head on a solid object." *Id.*

### B. Medical Evidence of Physical Impairments

The plaintiff was first injured in 1986 when a steel canopy from a mine buggy struck him on the right side of his neck. After the accident, the plaintiff visited the emergency room at Logan General Hospital. The attending physician at Logan General diagnosed a cervical strain.

The plaintiff was injured again in November of 1987. The plaintiff was setting timbers, which fell on him, injuring his neck, back, and arm. The plaintiff was seen by Dr. R. Padmanaban, an orthopedic surgeon, who diagnosed a cervical sprain and prescribed pain medication, muscle relaxers, and a soft cervical collar. The plaintiff missed a week of work. Because of the injury, the plaintiff received a permanent partial disability award from workers compensation in the amount of 8%.

In the years after these neck and back injuries, the plaintiff suffered an ankle sprain and a laceration of the thumb. The plaintiff received workers compensation benefits for both of these injuries, and both injuries caused the plaintiff to miss work for a number of weeks.

The record contains no medical evidence relating to the plaintiff's cervical sprain or any neck or back injury between the years of 1987 and 1991.

In January of 1991, the plaintiff began to experience chest pains while at work. The medical record does not reflect that the plaintiff suffered a heart attack; but, initially, physicians do appear to have attributed the plaintiff's pain to a circulatory problem. On July 8, 1991 the plaintiff reported further chest pains at a hospital visit, and a physician prescribed cardiac medicine. The next day, the plaintiff was back at the hospital with complaints of pain radiating down his left arm. X-rays were taken of the cervical spine on that visit. The films showed degenerative

changes in the cervical spine. At this point, the focus of the plaintiff's treatment appears to have shifted from his possible heart/circulatory problems, to his spinal injury. It is also at this point that the plaintiff ceased working.

For the next six years, the plaintiff was seen by a number of physicians for his neck and back pain. Consistently, the focus of the medical examinations was the cervical spine. The medical record from this period reflects differing medical opinions as to the source of the plaintiff's pain. However, the record is clear that the plaintiff had cervical and spinal abnormalities. The only question raised relates to the severity and effect of the abnormalities.

The defendants argue that the plaintiff's disability is not related to the 1986–1987 mine accidents. In other words, the defendant's argument rests on a lack-of-causation theory. Consequently, the medical evidence must be considered in light of the causation issue. With this discrete inquiry in mind, the Court turns to the medical evidence in the record.

On July 12, 1991, Dr. Joby Joseph, a neurologist from Logan General Hospital, examined the plaintiff. Dr. Joseph conducted Magnetic Resonance Imaging ("MRI") and CT scans on July 17. The MRI revealed a "bony spurring producing mild central spinal stenosis." Dr. Joseph also observed decreased sensation over the left deltoid and between the shoulder blade and left side. During the MRI examination, Dr. Joseph noted that the plaintiff attributed his current pain to his neck injury at work.

Dr. Hossein Sakhai saw the plaintiff on July 26. Dr. Hossein recorded the plaintiff's account of his injuries, including the neck and back injuries and chest pains. Dr. Hossein explained that a cardiology examination had revealed no abnormalities. He also explained that x-rays and MRIs of the neck had revealed degenerative changes. Dr. Hossein made a further radiographic study the cervical spine. This study revealed degenerative cervical changes and a calcium spur. However, Dr. Hossein opined that the cervical abnormalities were not the cause of the plaintiff's pain because there was no neurological signs and the changes were mild.

The plaintiff saw Dr. Adnan Silk on August 26, 1991 and complained of severe neck, arm, and shoulder pain. The plaintiff told Dr. Silk that the pain was not related to a new injury and that he had experienced pain since July. Dr. Silk noted neck tenderness and attributed the plaintiff's neck pain to cervical spondylosis and possible herniated disk. When Dr. Silk rechecked the plaintiff on August 30, the plaintiff was still experiencing neck tenderness.

In July of 1992, the plaintiff visited Dr. Panos Ignatiadis. Dr. Ignatiadis provided the first piece of evidence bearing on the issue of whether the plaintiff's cervical injuries were the result of the 1986 and 1987 accidents. Dr. Ignatiadis drafted a letter that is somewhat confusing. In the "Impressions" section of the letter, Dr. Ignatiadis makes the following statements:

> It is my opinion that the combined effect of the injuries he has had, as well as the type of work he does, leads him to have the complaint that he has currently. *I cannot attribute an event as such causing it . . . .*
>
> My recommendation currently is that he should be seen by a neurosurgeon and/or orthopedist of his choice for further evaluation for his neck and left arm *which historically has persisted since the initial injury in 1987, and progressed to the point where in 1991 he came off work.* I think that this case should be reopened, and assessment should be made to establish as to where he stands. He cannot return to his previous employment at this stage.

(Dfts.' Mot. for Summ.J., Ex. A at 605 (emphasis added).) The confusing aspect of Dr. Ignatiadis's letter is the conflicting statements concerning the cause of the

plaintiff's injury. On the one hand, Dr. Ignatiadis stated that he "cannot attribute an event as such causing it." On the other hand, he stated that the neck and arm pain have persisted since the initial injury in 1987. In addition, Dr. Ignatiadis stated that the "combined effect of the injuries" is consistent with the plaintiff's complaints of pain. Thus, while the statement, that he "cannot attribute an event as such causing it," arguably indicates that the doctor did not think that the current pain and 1987 injury were related, it is inconsistent with the remainder of his impressions, and, as is described below, it is inconsistent with his later diagnoses.

On November 18 and 23, 1992, the plaintiff saw Dr. Alfredo Velasquez. Dr. Velasquez noted tenderness in the plaintiff's neck. On the November 23rd visit, the plaintiff provided Dr. Velasquez with MRI films from the July, 1991 scan. Dr. Velasquez confirmed the existence of stenosis and also diagnosed bulging disks in the plaintiff's spine.

In April of 1993, the plaintiff attended a disability evaluation conducted by Dr. Patricia Campbell. Dr. Campbell noted tenderness in the plaintiff's cervical spine and either side of the neck. Dr. Campbell observed that the defendant was guarded, making a thorough examination of the neck impossible. However, she did observe the plaintiff voluntarily move his neck when asked to turn for an ear exam. Dr. Campbell's report suggests that she had questions about the severity of the plaintiff's neck pain. However, Dr. Campbell did not provide any indication as to whether or not the pain was related to the 1986 and 1987 injuries.

The plaintiff underwent a myelogram conducted at the Charleston Area Medical Center on February 18, 1994. The myelogram was negative and the examination noted that there was only minimal asymmetry of the nerve roots. The examination, however, detected slight asymmetry of spinal fluid "ventral to the cervical cord." But the notes indicate that this abnormality did not result in the displacement of the compressing cord. Again, this evidence may bear on the issue of disability, but it does not provide any information as to whether or not the asymmetry of the nerve roots is related to the 1986 and 1987 injuries.

In February of 1994, Dr. Ignatiadis stated that the plaintiff had reached maximum medical improvement. Dr. Ignatiadis then concluded that the plaintiff had been disabled from the time that the plaintiff quit working in 1991. Dr. Ignatiadis stated that the plaintiff's worsening pain in the cervical area was linked to his initial injury in 1987. Thus, Dr. Ignatiadis provides in his February, 1994 statement, the most definitive evidence that the plaintiff's cervical injury was related to the 1987 mine accident. This statement by Dr. Ignatiadis contradicts any possible suggestion in the 1992 letter that Dr. Ignatiadis believed that the plaintiff's current pain was unrelated to the 1986 and 1987 injuries.

Dr. Velasquez again saw the plaintiff in March of 1994. Dr. Velasquez also reported that the plaintiff had persistent cervical pain. However, Dr. Velasquez noted the negative myelogram and failed to comment on the cause of the plaintiff's pain.

The plaintiff visited Dr. Roger Baisas in February of 1996. Dr. Baisas conducted an additional myelogram and CT scan. Based on the examinations, Dr. Baisas diagnosed lumbar radiculopathy caused by nerve root impingement.

In June of 1996, the plaintiff attended a physical examination with Dr. Ebb Whitley of the West Virginia Department of Health and Human Resources. Dr. Whitley made some handwritten notes in a form entitled "General Physical." Dr. Whitley states, in conclusory fashion, that the plaintiff had a cervical sprain due to a mining accident and neck injuries from a mining accident. These notes are unclear. It is uncertain whether the notes are the doctor's impressions or recitations of the plaintiff's own description of his condition. Dr. Whitley's

notes arguably bear on the issue of whether the plaintiff's injury was related to the 1986 and 1987 accidents; but because in context the notes are ambiguous, they are of little help in establishing the cause of the plaintiff's neck pains.[1]

In October of 1996, the plaintiff visited with orthopedic surgeon, Dr. Phillip Van Pelt. Upon a physical examination of the plaintiff, Dr. Van Pelt noted that the plaintiff had tenderness over the posterior cervical area. Dr. Van Pelt reported that the plaintiff had little voluntary motion of the cervical spine. Dr. Van Pelt then diagnosed chronic pain syndrome in the neck and back with a possible herniated disk.

Dr. Baisas reported in March of 1997 that the plaintiff's condition remained the same. Dr. Baisas also recommended surgery, which was scheduled for April of 1997. The medical records indicate that the plaintiff indeed had surgery in April.

In September of 1997, Dr. Prasadarao Mukkamala issued a report concerning the plaintiff's condition after his cervical spine surgery. Dr. Mukkamala explained that the plaintiff had reached maximum medical improvement, and he diagnosed the plaintiff with a cervical sprain. Dr. Mukkamala stated that the plaintiff would not be able to perform his past job, and the plaintiff had a 32% whole person impairment due to the injury in 1987. Thus, Dr. Mukkamala based his disability determination on the plaintiff's neck and back injuries resulting from the 1987 mine accident. Dr. Mukkamala's report represents the final piece of medical evidence in the record concerning the plaintiff's physical condition.

## C. Evidence of Mental Impairments

In addition to the evidence of physical impairments, the plaintiff submitted evidence of mental impairments to the trustees. In September of 1994, the plaintiff was referred to Brian P. Bailey for possible depression associated with his worsening physical condition. The plaintiff was evaluated by Dr. D.H. Webb and Mr. Bailey. The two examiners diagnosed the plaintiff with major depression and borderline intellectual functioning. Dr. Webb opined that the plaintiff's depression was related to the plaintiff's injury in the mines, his chronic pain, and his reduced functional capacity.

In a report dated December 2, 1996, psychiatrist, Dr. Charles Weise, diagnosed the plaintiff with dysthmic disorder. However, Dr. Weise concluded that the disorder was not caused by the mine injury, as the onset of symptoms occurred several years after the injury. Dr. Weise, however, does not opine whether the disorder could have been caused by the symptoms of the injury, especially if the symptoms have become far more severe many years after the initial trauma. Nevertheless, the reports by Mr. Bailey, Dr. Webb and Dr. Weise represent the entire evidence of psychiatric disabilities.

## D. Social Security Disability Insurance Benefits

During the time that the plaintiff was undergoing treatment for his physical and mental disabilities, the plaintiff applied for Social Security Disability Insurance ("SSDI") benefits. In August of 1992, the plaintiff applied for benefits, alleging an onset date of July 8, 1991, the date that he stopped working. The plaintiff's application for SSDI was initially denied, and upon reconsideration, Social Security upheld the initial denial decision. The plaintiff subsequently appealed the denial to an Administrative Law Judge ("ALJ"). On September 14, 1994, the ALJ denied the plaintiff's disability application. The plaintiff appealed this decision in the United States District Court for the Southern Dis-

---

1. However, the ALJ that granted the plaintiff Social Security Disability Insurance benefits found Dr. Whitley's notes to be medical conclusions regarding the plaintiff's injuries. The ALJ relied in part on Dr. Whitley's conclusions in finding that the plaintiff was disabled.

trict of West Virginia. The district court upheld the ALJ's decision.

The plaintiff reapplied for SSDI benefits. In June of 1997, ALJ Harry Taylor determined that the plaintiff's prior application for benefits could not be reopened. However, the ALJ did find that the plaintiff was currently disabled for the period beginning August 13, 1994. The ALJ based the disability determination on cervical sprain, chronic pain syndrome, major depression, and generalized anxiety disorders.

In March of 1998, the Pension Plan denied the plaintiff's application for disability benefits. The denial letter stated that the plaintiff was unable to establish a causal link between his disability and his 1986 and 1987 mine accidents.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, to obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Here, the parties do not dispute the material facts contained in the administrative record. Accordingly, this case may be properly disposed of on summary judgment.

■ In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the United States Supreme Court established the standard of review for denial of benefits under an ERISA plan. In *Bruch*, the Court stated that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. If the plan's administrators have discretionary authority, a decision to deny benefits is reviewed for abuse of discretion and will not be disturbed if it is reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th

Cir.1995). The Fourth Circuit has consistently held that the UMWA 1974 Pension Plan gives the Trustees discretionary authority to determine eligibility for benefits. *See Lockhart v. UMWA 1974 Pension Trust*, 5 F.3d 74, 77 (4th Cir.1993); *see also Boyd v. Trustees of the United Mine Workers Health and Retirement Funds*, 873 F.2d 57, 59 (4th Cir.1989).

■ In determining whether a plan administrator or a fiduciary has abused his or her discretion in denying benefits, the Fourth Circuit has considered the following criteria:

> [W]e must give due consideration, for example, to whether the administrators' interpretation is consistent with the goals of the plan; whether it might render some language in the plan meaningless or internally inconsistent; whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA itself; whether the provisions at issue have been applied consistently; and of course whether the fiduciaries' interpretation is contrary to the clear language of the plan.

*Lockhart*, 5 F.3d at 77 (quoting de *Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989)). A decision to deny benefits is not an abuse of discretion if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997) (quoting *Bernstein*, 70 F.3d at 787). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a scintilla of evidence but may be somewhat less than a preponderance." *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.1984) (citations omitted). Thus, under the abuse of discretion standard, a court may not disturb a trustees' decision to deny a claimant pension benefits if the decision is supported by substantial evidence and is neither arbitrary nor capricious. *Id.* at 204.

## III. Disability Caused by a Mine Accident

The Fourth Circuit has also had the opportunity to consider the terms and provisions contained in the Pension Plan. In order to satisfy the requirement that the disability be "the result of a mine accident," the Fourth Circuit has stated,

[The total disability must] have been proximately caused by the mine accident. That is, if the plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is substantially responsible for plaintiff's inability to perform his job and for whatever medical and vocational reasons he is unable to perform an alternative job, then his total disability results from a mine accident.

*Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir.1988) (quoting *Horn v. Mullins*, 498 F.Supp. 1197, 1200 (W.D.Va.1980)); *see also Boyd*, 873 F.2d at 59 (quoting *Robertson*, 848 F.2d at 475). Thus, a claimant must prove that a mine accident "proximately caused" or was "substantially responsible" for his SSDI total disability in order to receive disability benefits under the Pension Plan. *Boyd*, 873 F.2d at 60; *Robertson*, 848 F.2d at 476. In addition, a mine accident injury can combine with another pre-existing or post-accident condition to qualify as a totally disabling injury if the mine injury exacerbates the other condition so that together they cause a finding of total disability by the Social Security Administration ("SSA"). *Chicarelli v. UMWA Health and Retirement Funds*, 943 F.2d 457, 463 n. 7 (4th Cir. 1991); *Boyd*, 873 F.2d at 60.

**2.** The Court notes that the ALJ attributed the plaintiff's disability to a cervical sprain, chronic pain, depression, and other anxiety orders. However, the chronic pain mentioned in the ALJ's decision clearly is related to the pain from the cervical sprain. Moreover, while the depression and anxiety disorders also appear to be related ultimately to the cervical sprain, the plaintiff need not establish that the psychiatric disorders were caused by the 1986 and 1987 mine accidents.

## IV. Discussion

■ The defendants claim that they did not abuse their discretion when they denied the plaintiff disability benefits. The defendants concede that the disability determination by SSA is conclusive proof of disability. However, they argue that the plaintiff failed to establish that his SSDI disability was the result of a mine accident. The Court **FINDS** that the defendants improperly discounted the medical evidence in the record when they relied solely on the lapse of time between the plaintiff's mine accident and a Social Security disability determination to support their conclusion that the plaintiff's disability was not caused by a mine accident.

It is undisputed that the plaintiff suffered a cervical sprain from mine accidents in 1986 and 1987. And, the ALJ's disability finding attributed the plaintiff's disability—in 1994—to a combination of cervical sprain, chronic pain, and depression and anxiety disorders. Therefore, the record is clear that there was a cervical sprain in 1986–1987, and a cervical sprain contributed to a disabling condition in 1994. The key inquiry then is whether the cervical sprain in 1994 was the same cervical sprain from 1986–1987.[2]

The defendants argue that the plaintiff has failed to present evidence of this causal link. The denial letter places a heavy emphasis on the fact that there is no medical evidence indicating pain or cervical sprain between 1987 and 1991. However, this lapse of time by itself does not break the causal link between the mine accident and the 1994 disability determination.

In the Fourth Circuit, the plaintiff need only establish that the disability was proximately caused by the mine accident. *See Robertson*, 848 F.2d at 476. The plaintiff had pain and a cervical sprain, which, if found to have been the result of a mine accident, would have proximately caused the plaintiff to be disabled. Thus, the key inquiry is whether the cervical sprain in 1994 was the same sprain caused by the mine accidents in 1986 and 1987.

This is especially true in light of medical evidence to the contrary. For instance, in 1991 Dr. Ignatiadis stated, "My recommendation currently is that he should be seen by a neurosurgeon and/or orthopedist of his choice for further evaluation for his neck and left arm *which historically has persisted since the initial injury in 1987, and progressed to the point where in 1991 he came off work.*" (Dfts.' Mot. for Summ.J., Ex. A at 605 (emphasis added).) In 1994, Dr. Ignatiadis again linked the plaintiff's cervical sprain to his 1987 mine accident. Finally, in his disability determination, Dr. Mukkamala stated that the plaintiff's neck and back injuries were caused by the 1987 mine accident. Thus, both Dr. Ignatiadis and Dr. Mukkamala provided medical evidence that the plaintiff's disability was the result of the 1987 mine accident. There is no medical evidence in the record that disputes the opinions of Dr. Ignatiadis and Dr. Mukkamala. The only contradictory evidence are the relatively weak inferences raised by the absence of medical evidence between the years of 1987 and 1991. The inferences raised from this lack of evidence are insufficient to overcome undisputed positive medical evidence to the contrary.

This case differs from other cases in which courts have found that an extended period of time between the onset date of disability and the mine accident breaks the causal link between the disability and the mine accident. See generally *Hurley v. Holland,* 929 F.Supp. 977, 979–80 (S.D.W.Va.1996) ("The onset date is entitled to 'great weight' in this circuit."); *see also, e.g., Osborne v. Trustees of the UMWA Health and Retirement Funds,* 953 F.2d 1383, *available at* 1992 WL 17303 (4th Cir.1992). For example, in *Osborne,* the plaintiff was injured in a mine accident, but continued to work thereafter. After several years, he began to suffer psychiatric disorders. SSA then awarded disability benefits based on the plaintiff's physical mine injury and the mental impairments. The court upheld the trustees' determination that the mine accident did not cause the disability.

The extended period of time between the accident and the disability determination in *Osborne* supported the theory that the mental impairments—which were well documented in the record—were the cause of the disability, rather than the physical injury. Thus, the determination that the causal link was broken was supported by substantial evidence. Here, there is no evidence of an alternative reason for the plaintiff's disability. The fact that the plaintiff became disabled later suggests that his condition worsened over time after the initial trauma. Because there is no evidence of an alternative source of the plaintiff's disability, the extended period of time between the injury and the disability onset date, by itself, does not break the causal link. *See generally Boyd,* 873 F.2d at 60 ("Boyd continuously complained of debilitating pain, repeatedly sought medical assistance for this pain, and finally was unable to continue work because of the disabling psychological effects of her injury. Whatever the contributions of her prior mental and emotional condition ..., Boyd's mine accident was 'substantially responsible' for her total disability as found for SSDI purposes.").

While the defendants offer an alternative theory of the disability,[3] there is absolutely no support for this theory, aside from pure speculation. The only positive evidence in the record that supports the defendant's finding that the cervical sprain in 1994 was not related to the 1986–1987 accidents is one comment contained in a confusing letter by Dr. Ignatiadis in 1992. However, to rely on an isolated, ambiguous comment in light of the remainder of Dr. Ignatiadis's statements would be an abuse

---

**3.** Ms. Marilyn Dyson, the registered nurse who wrote the denial recommendation hypothesized that the plaintiff likely was involved in another, non-mine-related accident around 1991, giving rise to the cervical pain that lead to the disability application. However, there is absolutely no evidence of any other accident in the record.

of discretion. First, the statement, "I cannot attribute an event as such causing it" is ambiguous when considered by itself. Admittedly, one possible interpretation of this sentence might be that Dr. Ignatiadis opined that the plaintiff's pain in 1992 was not caused by the 1986 and 1987 injuries. However, this interpretation is unreasonable when considered in light of the remainder of Dr. Ignatiadis's statements. In the very same letter, Dr. Ignatiadis stated that the plaintiff's pain has persisted since his injury in 1987. The doctor adds that the plaintiff's workers' compensation case should be reopened to consider the plaintiff's condition and partial disability status. Furthermore, Dr. Ignatiadis clearly stated in his 1994 letter that the plaintiff's injuries were related to his 1987 accident. This clear statement, and his recommendation for workers' compensation benefits, completely contradicts any contrary inference derived from the 1992 letter. Thus, there is absolutely no evidence that the disabling cervical sprain is related to another injury. It was an abuse of discretion for the defendants to discount the medical evidence in the record in favor of a speculative theory that lacks evidentiary support.

Finally, the defendants also argue that the medical evidence contains reports of degenerative disk disease. In light of the Q. & A. regarding progressive diseases, the defendants claim that the plaintiff's spinal pain and abnormalities were the result of a degenerative process, and therefore not covered by the plan. However, the progressive condition exception does not apply to this case. Here, the medical evidence shows that plaintiff suffered an injury that worsened over time after the initial trauma. Moreover, the initial trauma was the result of a mine accident, as defined by Q. & A. number 252. Such a situation is wholly different from diseases such as silicosis or tuberculosis that by their nature are contracted over time by exposure to certain conditions. Repeated exposure is not an "accident" like the initial trauma in this case.

Thus, the fact that the condition worsened over time does not remove the plaintiff's disability from coverage under the plan.

Because there is no dispute as to the material facts and for the reasons stated above, the plaintiff is entitled to judgment as a matter of law. Therefore, the Court **GRANTS** the plaintiff's Motion for Summary Judgment and **DENIES** the Defendants' Motion for Summary Judgment. Accordingly, the Court **ORDERS** that the defendants grant Mr. Lester disability pension benefits under the UMWA 1974 Pension Plan from August 13, 1994 through the present, with interest. In addition, the Court **ORDERS** the defendants to continue paying Mr. Lester current disability benefits consistent with the terms of the plan. Finding no reason to award costs, the Court **ORDERS** that each party is to bear its own costs.

The Court **DIRECTS** the Clerk to send a certified copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.