Ivory McCOY, Plaintiff–Appellee,

v.

Michael HOLLAND; Joseph P. Brennan; Marty D. Hudson; B.V. Hyler, Trustees of the 1974 Pension Plan, Defendants–Appellants.

No. 03–1223.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 22, 2004.

Decided: April 9, 2004.

**ARGUED:** Carolyn O'Meara Dutrow, Office of the General, United Mine Workers of America, Washington, D.C., for Appellants. Terry Gene Kilgore, Wolfe, Williams & Rutherford, Norton, Virginia, for Appellee. **ON BRIEF:** Glenda S. Finch, Deputy General, Michele Schoeppe, Senior Associate Counsel, UMWA Health & Retirement Funds, United Mine Workers Of America, Washington, D.C., for Appellants. Roger W. Rutherford, Wolfe, Williams & Rutherford, Norton, Virginia, for Appellee.

Before NIEMEYER, WILLIAMS, and GREGORY, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge WILLIAMS wrote the opinion, in which Judge NIEMEYER and Judge GREGORY joined.

## OPINION

WILLIAMS, Circuit Judge:

The Trustees of the United Mine Workers of America 1974 Pension Plan appeal the district court's summary reversal of their decision to deny disability pension benefits to Ivory McCoy. Finding that the decision of the Trustees was supported by substantial evidence, we reverse the district court and remand with instructions that summary judgment be entered in favor of the Trustees.

### I.

Ivory McCoy worked as a roof bolter for the Pittston Coal Company.[1] In April 1993, McCoy was hit in the head by a falling rock while working and was treated in the emergency room for a sprained neck. He was advised to miss three days of work, and a follow-up appointment was scheduled. In May 1993, his attending physician completed a report for the workers' compensation commission in which McCoy's diagnosis was listed as cervical muscle spasms. The record contains no evidence that McCoy sought any further medical treatment relating to pain in his neck or his back until May 1995. McCoy continued working in the mines until he was laid off in 1994. After being laid off, McCoy worked as a carpenter until August 1995, when, he claims, pain and psychological problems forced him to quit.

### A.

Starting in May 1995, nearly two years after the mine incident, McCoy began seeking and receiving treatment from a variety of physical and mental health professionals. McCoy first sought treatment from Dr. James Gardener for "neck stiffness, soreness, and right shoulder discomfort." (J.A. at 79.) Dr. Gardener diagnosed McCoy with scapulothoracic syndrome.[2] He prescribed Anaprox DS,

---

1. It appears that McCoy's direct employer was the Clinchfield Coal Company, a subsidiary of Pittston.

2. The parties define scapulothoracic syndrome as "a condition which frequently simulates a herniated cervical invertebral disk … [t]he pain often radiates to the neck and occiput … and may be accompanied by headache." (Appellant's Br. at 6 (quoting 5 J.E. Schmidt, *Attorney's Dictionary of Medicine Word Finder* s–42).)

an anti-inflammatory drug, and advised McCoy to apply moist heat and massage to the problem areas. McCoy visited Dr. Gardener again in January 1996, at which time he complained of headaches and increased pain in his neck and shoulder. Dr. Gardener gave McCoy a trigger-point injection of anti-inflammatory and pain medications. He also recommended that McCoy continue taking Anaprox DS and continue applying heat and moisture to his neck and shoulder.

In early 1996, Dr. Russell McKnight evaluated McCoy's psychological condition. Dr. McKnight reported in February 1996 that McCoy suffered from "Anxiety Depressive Syndrome with Insomnia secondary to Chronic Pain and Major Affective Disorder, Depression of Moderate Severity with Psychomotor Retardation." (J.A. at 87.)

McCoy next visited Dr. Calvin Johnson of Watauga Orthopaedics. Dr. Johnson found that McCoy's "X-rays of the cervical spine reveal-[ed] some degenerative cervical dis[c] disease[3] . . . [and] mild degenerative change at [the lumbar spine.]" (J.A. at 92.) He determined that McCoy suffered from chronic cervical strain and chronic low back syndrome.

McCoy later visited William Brezinski, a licensed psychologist, for an evaluation. Brezinski diagnosed McCoy with moderate to moderately severe dysthymic disorder,[4] moderate to moderately severe generalized anxiety disorder, and obsessive compulsive personality disorder.

3. Degenerative disc disease is not a medical term of art. Instead, it is a "convenient label . . . applied carelessly to a variety of distinct [degenerative] processes of spinal joints." 3 Donald Resnick M.D., *Diagnosis of Bone & Joint Disorders* 1372 (3d ed.1995). Degenerative diseases of the spinal joints commonly result from structural changes "in the vertebral bone and endplate, which occur with advancing age, [and] interfere with normal discal nutrition." *Id.* at 1373. One common degenerative disease of the spine is intervertebral chondrosis, which occurs when "[a]ging results in dehydration and loss of tissue resiliency in the intervertebral disc." *Id.* at 1375. Although the cause of intervertebral chondrosis is "not defined[,] . . . [t]he opinion that longstanding stress is important in its development has gained wide acceptance." *Id.* "Congenital factors may also be important." *Id.* Another disease often described by the catch-all phrase "degenerative disc disease" is spondylosis deformans, which is typified by bone outgrowths, called osteophytes, along the vertebral column. *Id.* at 1386. Spondylosis deformans is "extremely common" with "precipitously rising frequency . . . with advancing age." *Id.* at 1386. It is "generally . . . accepted" that spondylosis deformans is caused by repeated exposure to stress at the site of "abnormalities in the peripheral fibers" of the spinal column. *Id.* at 1388. Finally, the term "degenerative disc disease" is used to denote several varieties of osteoarthritis of the spine. *Id.* at 1396–1400. Osteoarthritis of the spinal joints is "similar to degenerative diseases of other synovial joints." *Id.* at 1396. Osteoarthritis is "a noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's Illustrated Medical Dictionary* 1199 (28th ed.1994).

Even though these degenerative diseases of the spine are separate, "some of the processes are related, [and] they frequently coexist at the same vertebral level." Resnick, *supra,* at 1404. "Degenerative changes of the cervical spine are common after the age of 40 years and affect more than 70 percent of patients older than 70 years." *Id.* at 1407. Similarly, "[d]egenerative changes in the lumbar spine . . . [are] detected . . . in 60 to 80 percent of men and women by the sixth decade of life, and in about 100 percent of subjects by the age of 70 years." *Id.* at 1408.

4. Dysthymic disorder, also known as dysthymia, is "a mood disorder characterized by depressed feeling . . . in which the associated symptoms . . . are not severe enough to meet the criteria for major depression." *Dorland's Illustrated Medical Dictionary* 519 (28th ed.1994).

In late 1996, Dr. Harry Kennedy performed an MRI of McCoy's neck and lumbar region. Kennedy noted degenerative changes in McCoy's neck. He also found bulging and protruding discs impinging on a neural foramen and displacing a nerve in McCoy's lumbar region.

In February 1997, McCoy was referred to Dr. Loepoldo Bendigo by the Social Security Administration for an evaluation in connection with his application for Social Security Disability Insurance (SSDI) benefits. Dr. Bendigo diagnosed McCoy as suffering from degenerative disc disease of the cervical spine and severe degenerative disease of the lumbar spine.

McCoy continued to visit Drs. Gardener and McKnight for the next several years, reporting pain in his neck and lower back as well as affective problems. McCoy was treated with a variety of anti-inflammatory, antidepressant, anti-anxiety and pain medications. McCoy also consulted an orthopedic surgeon, Dr. Schroering, but McCoy failed to introduce the results of Schroering's evaluations into evidence.

In August 1999, McCoy was examined by Dr. Alain Desy. (J.A. at 130.) Dr. Desy diagnosed McCoy with "Chronic Cervical Pain as the result of Post–Traumatic injury (Sprain/Strain) over pre-existing Spondylolysis[5] and Degenerative Changes, ... Chronic Low Back Pain due an aggravation of a pre-existing condition[, and] ... Mild Reactional Depressive State due to the [other] diagnos[e]s." (J.A. at 132.) Dr. Desy stated that "it [wa]s believed that all the above-mentioned diagnoses [we]re in relation to the work injury of 1993." (J.A. at 132.)

### B.

McCoy initially applied for disability pension benefits in 1996. The Trustees denied McCoy's application because he had not yet been awarded SSDI benefits. In February 2000, an administrative law judge (ALJ) determined that McCoy was entitled to SSDI benefits as of August 15, 1995. The ALJ found that McCoy was disabled primarily because of "severe major affective disorder" with a secondary diagnosis of "degenerative disc disease of the cervical and lumbar spine." (J.A. at 61, 70.) The ALJ noted that McCoy was able to perform medium exertion but concluded that his affective disorder prevented him from performing substantial gainful activity.

After McCoy was awarded SSDI benefits, the Trustees reconsidered McCoy's application. The Trustees again denied the application, this time because they determined that the medical evidence did not establish a causal link between the 1993 mine accident and McCoy's disabling conditions.

McCoy then filed a complaint in the United States District Court for the Western District of Virginia alleging that the Trustees abused their discretion when they denied his disability pension application. Both parties moved for summary judgment, and the district court granted McCoy's motion and held that the Trustees had abused their discretion. Accordingly, the district court ordered the Trustees to award McCoy a disability pension. The Trustees timely appealed.

### II.

### A.

 When an ERISA disability pension plan commits eligibility determinations to the discretion of the plan ad-

---

**5.** Spondylolysis is "a general term for degenerative changes due to osteoarthritis." *Dorland's Illustrated Medical Dictionary* 1564 (28th ed.1994).

ministrator or fiduciary, we review those determinations for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "It is well-established that the abuse of discretion standard under [*Firestone]* is applicable to our review of the Trustees' decisions under the UMWA pension plans." *Hale v. Trustees of United Mine Workers Health & Ret. Funds,* 23 F.3d 899, 901 (4th Cir.1994). Under this standard, "we will not disturb such a decision if it is reasonable." *Booth v. Wal–Mart Stores, Inc. Assoc. Health and Welfare Plan,* 201 F.3d 335, 342 (4th Cir.2000).

■ Although we may consider many factors in determining the reasonableness of a fiduciary's discretionary decision, *see Booth,* 201 F.3d at 342–343; *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997); *Lockhart v. United Mine Workers of Am.1974 Pension Trust,* 5 F.3d 74, 77 (4th Cir.1993), the only factor at issue here is the degree to which the considered materials support the Trustees' decision. *See Booth,* 201 F.3d at 342 (listing the "adequacy of the materials considered to make the decision" as a factor). In other words, given the context of this case, the Trustees' decision is reasonable if it is supported by substantial evidence. *See Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir.1995).

## B.

A claimant must make three showings to be eligible for a disability pension under the 1974 UMWA pension plan. *See Boyd v. Tr. of United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989). First, the claimant must establish that he was involved in a mine accident. *Id.* Second, he must show that he has been awarded SSDI benefits, thus conclusively establishing that he has a disabili-

ty (Qualifying Disability). *Roberston v. Connors,* 848 F.2d 472, 475 (4th Cir.1975). Finally, he must prove that the mine accident proximately caused, or was substantially responsible for, the Qualifying Disability. *Id.; Boyd,* 873 F.2d at 59.

■ The Trustees use a set of inquiries, called "Q & As," to help them interpret the terms of the 1974 pension plan. *See Brogan,* 105 F.3d at 162. The Trustees promulgate these Q & As pursuant to their authority under the Plan to issue rules and regulations implementing the Plan. *See Lockhart v. United Mine Workers of Am. 1974 Pension Trust,* 5 F.3d 74, 77, 78 (4th Cir.1993). We "afford the Trustees' interpretation of these rules the same deference that we give the Trustees' interpretation of the language of the Plan itself." *Brogan,* 105 F.3d at 162. According to Q & A 252, "miners who become disabled by progressive diseases or conditions such as black lung, silicosis, tuberculosis, arthritis, rheumatism, etc., cannot be considered 'disabled as the result of a mine accident.' " (J.A. at 323.) When a progressive disease combines with a mine accident to proximately cause a claimant's Qualifying Disability, however, the claimant is eligible for a disability pension. *See Richards v. United Mine Workers of Am. Health & Ret. Fund,* 895 F.2d 133, 136–137 (4th Cir.1990) (explaining that Q & A 252(k) requires benefits when a mine worker "suffers a heart attack while pushing a heavy object in the normal course of his job"); *Chicarelli v. United Mine Workers of Am. Health & Ret. Funds,* 943 F.2d 457, 462 (4th Cir.1991) (same).

■ In this case, the Trustees determined that McCoy's disability was substantially caused by a combination of his degenerative disc disease and his affective disorder and that neither was caused by a

mine accident.[6] Because degenerative disc disease is a progressive condition, they reasoned, it could not have been caused by a mine accident. In addition, the Trustees concluded that the mine accident did not "aggravate[ ] or exacerbate[ ]" McCoy's degenerative disc disease. (J.A. at 28.) The Trustees also found that McCoy's affective problems were aggravated by pain from his degenerative disc disease, but not by pain arising from his mine accident.

The Trustees' conclusions are supported by the following undisputed facts, several of which show that there was a substantial lapse of time between the mine accident and McCoy's initial complaints of debilitating pain:

● The ALJ determined that McCoy became disabled on August 15, 1995, more than two years after the mine accident;

● The ALJ found that McCoy was disabled primarily because of "severe major affective disorder" with a secondary diagnosis of "degenerative disc disease of the cervical and lumbar spine," (J.A. at 61, 70);

● McCoy was given only three days of leave following the mine accident;

● McCoy continued working in the mine after the accident until he was laid off one year later;

● After being laid off, McCoy worked as a carpenter for approximately sixteen months, (J.A. at 130);

● No evidence in the record indicates that McCoy sought any medical treatment relating to the mine accident between May 1993, shortly after the mine accident, and May 1995;

● No evidence in the record indicates that McCoy was experiencing neck, back or shoulder pain between May 1993 and April 1995;

● McCoy was diagnosed with several psychological disorders in 1996 and 1999, more than two years after the mine accident;

● McCoy has been diagnosed with degenerative disc disease on numerous occasions by several different physicians; and

● The only doctor to opine that McCoy's disability was related to the mine accident did not examine McCoy until August 1999, more than six years after the accident.

This evidence supporting the Trustees' decision is substantial, and it was reasonable for the Trustees to conclude that McCoy's disability was proximately caused by a combination of his psychological problems and his degenerative disc disease, not by the mine accident.

Instead of noting the abundance of evidence supporting the Trustees' determination, the district court improperly engaged in a *de novo* review of the record. The district court believed that "[i]t [wa]s only logical that when a person is hit on the head, that parts of the body, like the spine, the shoulders, and the neck, which are all in direct lineage would also suffer trauma from such an injury." (J.A. at 268.) Starting from this proposition, the district court concluded that "McCoy's diagnosis of degenerative disc disease cannot rightfully be labeled as a 'progressive disease.'" (J.A. at 268–69.) First, we believe that the "logical truth" relied upon by the district court is essentially a factual medical judgment that should be made by trained medical professionals. If the medical evidence is unclear, the Plan grants the Trustees, not the court, the discretion to resolve any

---

**6.** McCoy did not complain of a psychological or psychiatric problem until January 30, 1996. The Trustees found that the "first evidence of back pain" was on August 15, 1996. (J.A. at 35.) The Trustees did not conclude that these conditions were pre-existing.

conflicts and draw reasonable inferences from the record. *See Lockhart,* 5 F.3d at 77. Second, even if the district court's premise were correct, the conclusion that it drew from that premise was not. The Trustees have decided that degenerative disc disease is a "part of the normal aging process[ ] and [that] it is a progressive disease."[7] (J.A. at 28.)*See also* Q & A 252 ("[M]iners who become disabled by progressive diseases or conditions such as black lung, silicosis, tuberculosis, *arthritis, rheumatism, etc.,* cannot be considered 'disabled as the result of a mine accident' under the test stated above.") (emphases added) *reproduced at* (J.A. 323). As such, degenerative disc disease cannot be proxi-

mately caused by a mine injury for purposes of the UMWA 1974 Pension Plan.[8] Accordingly, a mine worker whose SSDI award states that he is disabled as a result of degenerative disc disease must prove to the Trustees that a mine accident combined with or exacerbated his disc disease to proximately cause his disability. *See Chicarelli,* 943 F.2d at 462. The Trustees did not abuse their discretion by determining that McCoy had not made such a showing in this case.

### III.

For the foregoing reasons, we reverse the judgment of the district court and

---

**7.** We note that all of the diseases commonly referred to as "degenerative disc disease" are progressive conditions that develop slowly with advancing age. *See supra* note 3. Because, in both technical and general usage, the term "degenerative disc disease" denotes progressive conditions, the Trustees' determination that degenerative disc disease is a "progressive disease" within the meaning of Q & A 252 is a reasonable one. *See Brogan v. Holland,* 105 F.3d 158, 162 (4th Cir.1997) ("[We] afford the Trustees' interpretation of the[ Q & As] the same deference that we give the Trustees' interpretation of the language of the Plan itself."). We further note that McCoy has offered no evidence suggesting that "degenerative disc disease" is anything other than one of the progressive conditions described in note 3, *supra.* Without such evidence, we have no reason to doubt the Trustees' reasonable interpretation of the progressive disease exclusion in Q & A 252.

**8.** In his brief, McCoy relies on *Lester v. United Mine Workers of Am. Health & Ret. Fund,* 40 F.Supp.2d 800 (S.D.W.Va.1999). We note that district court opinions, whether appealed or not, are not binding on this court, unless they are adopted by or incorporated into one of our published opinions. *See, e.g., Ashley River Industries, Inc. v. Mobil Oil Corp.,* 245 F.3d 849 (4th Cir.2001). To the extent that McCoy's brief can be read to assert that *Lester* collaterally estops the trustees from arguing that degenerative disc disease is a progressive disease, we note that McCoy did not raise collateral estoppel before the district court,

and he is thus precluded from raising it for the first time on appeal. *See Am. Canoe Ass'n v. Murphy Farms,* 326 F.3d 505 (4th Cir. 2003). Moreover, even assuming arguendo that the issue of collateral estoppel is properly before us, we do not believe that the Trustees are estopped from arguing that degenerative disc disease is a progressive disease. Importantly, the court in *Lester* did not hold that degenerative disc disease is not a progressive disease. *See Lester,* 40 F.Supp.2d at 809. The court merely held that Lester's *cervical sprain,* which an ALJ had determined was the cause of Lester's disability, was caused by a mine accident. *Id.* at 807. Although in the course of that determination the court rejected the Trustees' assertion that Lester's disability was caused by degenerative disc disease, *see id.* at 809, the court in no way implied that degenerative disc disease is not a progressive disease. *Id.* Accordingly, it would be inappropriate to collaterally estop the Trustees from arguing that degenerative disc disease is a progressive disease, because that issue was not actually litigated or decided in *Lester. See Orca Yachts, L.L.C. v. Mollicam, Inc.,* 287 F.3d 316, 318 (4th Cir.2002) ("Issue preclusion operates to bar subsequent litigation of those legal and factual issues common to both actions that were 'actually and necessarily determined by a court of competent jurisdiction in the first litigation.' ") (quoting *In re Varat Enters., Inc.,* 81 F.3d 1310, 1315 (4th Cir.1996)).

remand with instructions to enter summary judgment in favor of the Trustees.

*REVERSED AND REMANDED WITH INSTRUCTIONS*