**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

REBECCA DuPERRY,

     *Plaintiff-Appellee,*

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

     *Defendant-Appellant.*

No. 10-1089

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Louise W. Flanagan, Chief District Judge.
(5:08-cv-00344-FL)

Argued: December 8, 2010

Decided: January 24, 2011

Before TRAXLER, Chief Judge, WYNN, Circuit Judge,
and David A. FABER, Senior United States District Judge
for the Southern District of West Virginia,
sitting by designation.

---

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Wynn and Senior Judge Faber joined.

---

## COUNSEL

**ARGUED**: Ian Taylor, DLA PIPER US LLP, Baltimore,
Maryland, for Appellant. Andrew O. Whiteman, HARTZELL

& WHITEMAN, LLP, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Christopher S. Gunderson, DLA PIPER US LLP, Baltimore, Maryland; Michael T. Medford, MANNING FULTON & SKINNER PA, Raleigh, North Carolina, for Appellant.

## OPINION

TRAXLER, Chief Judge:

Life Insurance Company of North America ("LINA") appeals a district court order granting judgment to Rebecca DuPerry on her claim that LINA wrongly denied her long-term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C.A. § 1132(a)(1)(B) (West 2009). Finding no error, we affirm.

I.

DuPerry worked as a payroll and benefits clerk for Railroad Friction Products Corporation ("RFPC") until April 7, 2006. While at RFPC, she participated in a group LTD benefits plan administered by LINA and funded by an insurance policy that LINA issued ("the Policy"). The parties agree that the LTD plan is "an employee benefit plan," as that term is defined in ERISA. *See* 29 U.S.C.A. § 1002(3). To qualify for LTD benefits, participants must be "Disabled," and "must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy." J.A. 63. Until an employee has received 24 months of LTD benefits, she is "Disabled"

if, solely because of Injury or Sickness, . . . she is:

1. unable to perform the material duties of . . . her Regular Occupation; and

2. unable to earn 80% or more of . . . her Indexed Earnings from working in . . . her Regular Occupation.

J.A. 58. Once disability benefits have been payable for 24 months, she is disabled if

solely due to Injury or Sickness, . . . she is:

1. unable to perform the material duties of any occupation for which . . . she is, or may reasonably become, qualified based on education, training or experience; and

2. unable to earn 60% or more of . . . her Indexed Earnings.

J.A. 58. An employee's "regular occupation" is defined as "[t]he occupation the Employee routinely performs at the time the Disability begins." J.A. 74. LINA classified DuPerry's regular occupation as a payroll benefits HR administrator as "sedentary," meaning that it required lifting, carrying, pushing, or pulling 10 pounds occasionally and that although it involved mostly sitting, it could involve standing or walking for brief periods. The Policy further provides that an employee "must provide [LINA] . . . satisfactory proof of Disability before benefits will be paid." J.A. 63. Finally, "[t]he Elimination Period is the period of time an Employee must be continuously Disabled before Disability Benefits are payable," J.A. 63, which was 180 days for DuPerry.

Following what DuPerry asserted was the expiration of her elimination period, DuPerry first submitted a proof of loss form to LINA on October 16, 2006, claiming that she was disabled as a result of rheumatoid arthritis, osteoarthritis, and fibromyalgia.[1]

---

[1]Rheumatoid arthritis is "an inflammatory disease of the joints that causes the joints to swell and to stiffen. It is a chronic condition, perma-

In evaluating DuPerry's claim, LINA reviewed medical records of her primary care physician, Dr. Glenn Harris, and her treating rheumatologist, Dr. Supen Patel, as well as "Attending Physician's Statement of Disability" forms that the doctors had completed. Dr. Harris's form noted his diagnosis of rheumatoid arthritis and stated that DuPerry was limited to "0 hours" per day of climbing, balancing, stooping, kneeling, crouching, crawling, reaching, walking, sitting, and standing, and that DuPerry would "never" be able to return to work. J.A. 795. Dr. Harris also indicated on a "Physical Ability Assessment Form" that DuPerry could "[o]ccasionally" sit, stand, walk, reach, engage in fine manipulation, grasp, lift, carry, stoop, or push or pull up to 10 pounds, where "[o]ccasionally" was defined alternatively as 1% - 33% of an eight-hour workday or less than 2.5 hours. J.A. 768.

Dr. Patel's Attending Physician's Statement of Disability form noted his diagnosis of rheumatoid arthritis and osteoarthritis. In a column titled "Cardiac – If applicable," Dr. Patel marked a box for "Class 4 – Complete Limitation." J.A. 797. In response to a question of when DuPerry would be able to return to work, Dr. Patel wrote "Never – [DuPerry] is Permanently disabled." J.A. 797. And, where the form asked for DuPerry's "maximum level of ability (sedentary, light, medium, heavy)" for lifting, carrying, pushing, or pulling, Dr. Patel selected the lowest available choice of "Sedentary = 10 lbs. maximum, walking occasionally." J.A. 797.

---

nent in nature." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 948 (7th Cir. 2000). Osteoarthritis is "a noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *McCoy v. Holland*, 364 F.3d 166, 168 n.3 (4th Cir. 2004) (internal quotation marks omitted) (alteration in original). Fibromyalgia is a rheumatic disease with symptoms that include "significant pain and fatigue, tenderness, stiffness of joints, and disturbed sleep." *Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 303 (4th Cir. 2004) (internal quotation marks omitted). Fibromyalgia is diagnosed "based on tenderness of at least eleven of eighteen standard trigger points on the body." *Id.*

Two other documents that LINA considered in its initial review are relevant to this appeal. First, a 2006 blood test report showed DuPerry as having normal levels of hematocrit and hemoglobin. Second, a physical therapist's report dated April 12, 2006, indicated that DuPerry had "made small strength and endurance gains" and had "demo[nstrated] excellent compliance." J.A. 813. The form also noted that DuPerry was able to walk 10 laps around the approximately 170-foot gym track in nine minutes.

Melissa Graham, the case manager handling DuPerry's claim for LINA, requested that a nurse case manager ("NCM") telephone Dr. Patel for clarification of the information he had provided on his physician's statement of disability form, specifically his decision to circle "sedentary." Dr. Patel spoke to the NCM on November 3, 2006, informing her that fibromyalgia, fatigue and side effects from her pain medications prevented DuPerry from working, even though her rheumatoid arthritis was under control. He further explained that DuPerry suffered from achiness and stiffness coinciding with changes in the weather, and that she had been responding well to medications. This assessment was consistent with notations in LINA's notes, which stated "[Return-to-work] date clear. NO both [attending physicians] stating [claimant] is permanently disabled."[2] J.A. 903. Nevertheless, the NCM eventually concluded that DuPerry had not submitted satisfactory proof that she suffered from a continuing disability from her regular occupation during the elimination period.

LINA informed DuPerry by letter dated November 10, 2006, of its decision to deny her claim because of a lack of medical evidence of her disability. The letter referenced the medical records LINA had reviewed, mentioning in particular five office notes from Dr. Patel, six from Dr. Harris, and the

---

[2]This note would appear to mean that there clearly is no return-to-work date according to both attending physicians, who are stating that the claimant is permanently disabled.

NCM's telephone conversation with Dr. Patel. The letter concluded:

> Our NCM opined that we do not have medical information on file to support the restrictions and limitations given by your providers. Our NCM opined that we do not have diagnostic testing to suggest severity of illness precluding you from performing a sedentary occupation.

J.A. 309.

DuPerry appealed LINA's initial denial by a letter dated May 7, 2007, that referenced nearly 400 pages of documents in support of her claim.

The appeal included letters from Drs. Harris and Patel. Dr. Harris's November 27, 2006, letter explained how DuPerry's situation had worsened over the years to the point that her pain was almost unbearable in May 2005, and Harris had urged her to stop work. The letter stated that DuPerry had nevertheless attempted to continue working, but, by February 6, 2006, "she was at the point that even Percocet twice a day was not quite enough to hold her," and she agreed to stop work. J.A. 462.

Dr. Patel's January 12, 2007, letter explained that while DuPerry's arthritis had "been reasonably well controlled" by her medications and, although her fibromyalgia and fatigue symptoms were managed with medications, they "make[ ] it difficult for her to function." J.A. 518. Thus, Dr. Patel concluded that "because of the above medical problems and complications thereof and medications, [DuPerry] certainly is not able to return to any previous work duties." J.A. 518. An exam report also dated January 12, 2007, noted that DuPerry's pain seemed to be worse than it had been, and that while she was taking 5 milligrams of Percocet three to four times a

day, Dr. Patel additionally prescribed 10 milligrams of Oxy-Contin per day.[3]

Dr. Patel's notes from May 9, 2007, reported that DuPerry's "pain seem[ed] to be better," but her fatigue had worsened somewhat and she "still ha[d] not much energy level." J.A. 228. Dr. Patel's report dated July 3, 2007, stated that DuPerry was experiencing "quite a bit of pain" in her back from her osteoarthritis of the lumbar spine with intermittent sciatic symptoms. J.A. 229. He noted that by that time, along with the Percocet, DuPerry was using 20 milligrams of OxyContin twice a day, which was "making her sleepy and drowsy." J.A. 229. He reported that DuPerry "needs to limit her activities" such that if she did "five to ten minutes of work," she needed to "rest[ ] for about 30 to 40 minutes before returning . . . to work duties." J.A. 229. Dr. Patel's notes from September 17, 2007, reported that DuPerry was "still symptomatic with pain and discomfort" and that he had increased several of her medications, including increasing her OxyContin to 30 milligrams. J.A. 224. He noted that she was "having symptoms of constipation and excessive drowsiness with the OxyContin." J.A. 224.

In addition to the medical records and letters, included in the materials was a letter from DuPerry's former boss, who described DuPerry as having a "work ethic" that is "unsurpassed." J.A. 463. He described DuPerry's transition from "one of the most valuable employees" he had known to someone "sitting at her desk trying valiantly to work" with "her hands trembling so badly that she could hardly hold a pencil." J.A. 463. DuPerry's appeal also included a declaration, her own DVD filmed at her home, supporting statements from several relatives, and her prescription medication list. Her evidence showed how she depended on help from her family for most household chores, errands, and shopping and that at times she used a cane, a walker, and a wheelchair. She gener-

---

[3]Percocet and OxyContin are powerful narcotic painkillers.

ally remained in her bedroom, in which she had a hospital bed and a refrigerator.

Nancy Ippolito, LINA's appeal claim manager, requested a full review of the claim by Dr. Charles McCool, a licensed physician and a LINA employee. Dr. McCool's resulting report consisted of a half-page of largely illegible, handwritten notes. However, according to Ippolito's summary of his views, McCool recommended affirming the benefits denial and noted that updated letters from DuPerry's treating physicians showed "minimal exam findings" and levels of hematocrit and hemoglobin of "around 11/32." J.A. 874. LINA subsequently advised DuPerry that her appeal had been denied. In its denial letter, dated May 31, 2007, LINA acknowledged Dr. Patel's diagnoses of rheumatoid arthritis and fibromyalgia. LINA nevertheless emphasized that Dr. Patel's records demonstrated that DuPerry's medications were keeping her rheumatoid arthritis reasonably under control and her fibromyalgia and fatigue were "secondary to the underlying disease process and . . . managed with medication." J.A. 302. LINA also noted that Harris had "previously completed a Physical Ability Assessment form in October of 2006 indicative of sedentary capacity, but he has not released Ms. DuPerry to return to work." J.A. 302. LINA further stated that the physician who reviewed her file had determined that "the records do not show a severe impairment that would prevent Ms. DuPerry from performing at the sedentary demand level." J.A. 302. In concluding, LINA stated:

> Ms. DuPerry's physicians have failed to provide clinical data to correlate with an impairment that would preclude work at the sedentary demand level. The [reviewing physician] noted that there are only minimal examination findings and the hematocrit and hemoglobin are near normal and do not explain fatigue. Furthermore the records document that Ms. DuPerry's conditions are under control with medication.

J.A. 302.

By letter dated November 26, 2007, DuPerry once again appealed LINA's denial of benefits. Along with her appeal, she included additional medical records from Dr. Patel, Dr. Harris, and Dr. Misty L. Sinclair. She also included a second DVD documenting her condition. LINA assigned the second appeal to a third claim manager, Andrea Russo, who requested a review of DuPerry's records from an independent rheumatology consultant. That review was completed by Dr. Marc Levesque, a board-certified rheumatologist with the Duke University Medical Center.

Dr. Levesque produced two reports recommending denying DuPerry's appeal. In a report dated January 31, 2008, Dr. Levesque noted Dr. Patel's and Dr. Harris's diagnosis of DuPerry with "a combination of rheumatoid arthritis, osteoarthritis, and fibromyalgia," J.A. 172, but he concluded that Dr. Patel's and Dr. Harris's restrictions nevertheless "are not supported," J.A. 174. Dr. Levesque noted that DuPerry's "rheumatoid arthritis appears to be under excellent control with a combination of medicines that are typically used for the treatment of rheumatoid arthritis" and that "the video movements, especially of [DuPerry's] hands and also of her ambulation would suggest that there is no permanent deformity and no significant swelling associated with the patient's rheumatoid arthritis that would preclude most sedentary occupations, including" DuPerry's occupation. J.A. 173-74. As for her fibromyalgia, Dr. Levesque stated that "given the absence of physical limitations due to this problem, there is nothing that would preclude [DuPerry] normally from pursuing a typical sedentary occupation," and "[g]enerally, patients with fibromyalgia are able to work a sedentary occupation." J.A. 174. Dr. Levesque did note that DuPerry's chronic pain and fibromyalgia "appear[ed] to be complicated by the presence of depression" but stated that whether the depression would prevent DuPerry from being able to work was a question outside of his area of expertise. J.A. 174.

In a subsequent report, dated February 10, 2008, Dr. Levesque also considered the DVD DuPerry provided with her second appeal.[4] In the report, Dr. Levesque stated:

> [a]s noted in the previous video, no deformity is noted of [DuPerry's] hands or other joints. There appears to be relatively normal range of motion in most of her joints, based on the limited video that is available. The major area of stiffness and limited range of motion appears to be in her back and the limitation primarily appears to be due to pain rather than other factors, based on the limited footage in the video.

J.A. 144. Dr. Levesque also concluded that "with regards to [DuPerry's] work capacity, as in the previous video of [DuPerry] in her home, this video supports the idea that [DuPerry's] primary problem is fibromyalgia and perhaps some osteoarthritis of her knees." J.A. 144. He stated,

> [The video] indicates that her rheumatoid arthritis is not likely to be a significant cause of her inability to work or her inability to perform most activities of daily living given the fact that the underlying major diagnosis for [DuPerry's] pain appears to be fibromyalgia. Since it appears to be fibromyalgia, and given the lack of physical findings associated with this diagnosis, it does not adequately support the

---

[4]LINA instructed Dr. Levesque to telephone DuPerry's treating physicians if Dr. Levesque had any questions he needed answered. When DuPerry's attorney learned that Dr. Levesque might be doing this, he sent LINA a letter revoking any consent that DuPerry had given for her doctors to speak to LINA's physicians by phone, stating, "It has been my experience that such peer-to-peer contacts frequently result in disputes about what was said by the treating physician." J.A. 215. The letter made clear, however, that LINA was free to request DuPerry's medical records and submit any questions to the doctors in writing through DuPerry's attorney.

limitations imposed on [DuPerry's] ability to work by her [treating physicians].

J.A. 144.

Based on Dr. Levesque's review, by letter dated February 15, 2008, LINA once again affirmed its decision to deny DuPerry's claim for LTD benefits. The letter summarized Dr. Levesque's conclusions and stated that DuPerry had "exhausted all administrative levels of appeal and no further appeals w[ould] be considered." J.A. 165.

DuPerry filed this action pursuant to 29 U.S.C.A. § 1132(a)(1)(B) of ERISA, in federal district court on July 18, 2008, alleging that she was wrongly denied benefits under the Policy. LINA answered, denying that DuPerry was eligible for benefits. On August 10, 2009, the district court granted judgment to DuPerry, ordering LINA "to pay [DuPerry] disability income benefits as calculated under the provisions of the Policy, from the expiration of plaintiff's elimination period through the date of this order." J.A. 1014.

Observing that "[t]his case falls into that difficult class of ERISA disability cases involving subjective complaints of pain as a primary cause and driver of the insured's claim of disability," J.A. 1008, the district court noted that no language in the plan specifically concerned the evaluation of claims involving subjective complaints of pain. The court reasoned:

> Where the plan documents do not provide a procedure for dealing with disability claims based on subjective complaints of pain, a plan administrator employing a principled reasoning process need not simply accept a claimant's subjective complaints of pain without question, especially if there is other conflicting evidence in the record. Neither, however, can a plan administrator in such a situation simply dismiss such subjective complaints of pain out of

hand, especially where there is objective medical
proof of a disease that could cause such pain.

J.A. 1009.

LINA pointed to statements in six health care records as
conflicting with DuPerry's complaints of disabling pain and
fatigue. The district court concluded, however, that the
alleged conflicts were only "minor inconsistencies," not "the
type of substantial conflicting evidence that a plan administra-
tor can use to justify a denial of benefits." J.A. 1012. While
LINA attempted to use some of this evidence to justify a con-
clusion that Dr. Patel may not have actually believed that
DuPerry was unable to return to work, the court concluded
that the remaining evidence in the record clearly demonstrated
that Dr. Patel believed DuPerry could not return, and that
LINA's own notes reflected that. As for Dr. Levesque's
reports, the court noted that Dr. Levesque dismissed the
notion that DuPerry's fibromyalgia was disabling "because of
'the absence of physical limitations due to this problem' and
'the lack of physical findings associated with this diagnosis.'"
J.A. 1013. But, the court noted that the presence of painful
trigger points that are indicative of fibromyalgia "were amply
documented," J.A. 1013 n.11, and the court concluded that
Dr. Levesque offered no basis for his rejection of DuPerry's
evidence that her pain from that condition was physically dis-
abling. To the extent that Dr. Levesque believed that DuPerry
was in fact unable to work but was not "disabled" because her
inability to work was due only to pain or other self-reported,
subjective symptoms, the court reasoned that Dr. Levesque
was utilizing a definition of "disabled" plainly at odds with
the one given in the plan. Thus, the court concluded that "[b]y
adopting Dr. Levesque's opinion, [LINA] essentially grafted
a new limitation regarding disability onto the plan" that the
language of the plan did not support. J.A. 1014.

LINA moved to alter the judgment to limit payment of ben-
efits to the period running from the expiration of DuPerry's

elimination period through October 5, 2008, which is the end of the term for which LINA determines disability according to DuPerry's ability to perform the duties of her regular occupation ("the regular-occupation period"). LINA argued that the district court could not award benefits for the subsequent "any-occupation" period because LINA had not considered DuPerry's claim under the standard that applied for that period. Thus, LINA requested that the court remand to the plan administrator for a decision regarding benefits for this period. The district court denied the motion, concluding that remand was not appropriate because the record clearly showed the DuPerry was entitled to benefits for both periods. The court also awarded prejudgment interest and attorney's fees.

## II.

LINA first argues that the district court erred in concluding as a matter of law that LINA abused its discretion in denying DuPerry's claim. We disagree.

In reviewing the denial of benefits under an ERISA plan, a district court first must consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination. *See Johannssen v. District No. 1-Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 168 (4th Cir. 2002). "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005). The parties agree that the plan confers discretionary authority upon LINA, as the plan administrator, to make benefit decisions according to the plan's terms.

Under the abuse-of-discretion standard, the reviewing court will set aside the plan administrator's decision only if it is not

reasonable. *See Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 307 (4th Cir. 2004). The administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995) (internal quotation marks omitted), which is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion," *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984) (internal quotation marks omitted).

In *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), we set forth eight nonexclusive factors to be considered by courts in reviewing the a plan administrator's decision for reasonableness:

> 1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43. These factors continue to guide our abuse-of-discretion review under ERISA. *See Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

Prior to the Supreme Court's issuance of *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), our precedent called for review of a plan administrator's decision under a "modified abuse-of-discretion" standard. *See Ellis v. Metro-*

*politan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997). Under this standard, when a plan administrator had a conflict of interest because the administrator was responsible for both evaluating and paying claims, courts would afford less deference to the administrator's decision. *See id.* In *Glenn*, however, the Supreme Court clarified that the presence of such a conflict does not alter the applicable standard of review, but rather is "but one factor among many that a reviewing judge must take into account." *Glenn*, 554 U.S. at 116. In the present case, because LINA insures the plan as well as administering it, LINA has a "structural conflict of interest," *Williams*, 609 F.3d at 632, and we therefore consider this factor in determining the reasonableness of LINA's decision, *see Glenn*, 554 U.S. at 112.

LINA points to seven items of evidence in defending the reasonableness of its decision to deny DuPerry's claim:

- Dr. Patel's statement in his May 31, 2006, Attending Physician Statement that DuPerry could perform some "[s]edentary" job functions. J.A. 797.

- Dr. Patel's November 3, 2006, telephone message stating that DuPerry's arthritis was "controlled" and that she had had a "good response" to medications and had "not called [with] complaints" since September 2006. J.A. 898.

- Dr. Harris's statement in his October 25, 2006, Physical Ability Assessment form that DuPerry was able to perform functions associated with sedentary work.

- Dr. Patel's letter dated January 12, 2007, stating that DuPerry's "arthritis is moderately active and has been reasonably well controlled with . . . medications" and that her "fibromyalgia and

fatigue symptoms are secondary to her underlying disease process and are all managed with . . . medications." J.A. 518.

- DuPerry's physical therapist's note in an assessment that DuPerry demonstrated excellent compliance, made small strength and endurance gains, could complete ten laps around the gym track in nine minutes, and did not note any limitations or restrictions due to pain.

- DuPerry's blood tests showing normal levels of hematocrit and hemoglobin.

- Dr. Levesque's determination that DuPerry's doctors' opinions that she could not return to work were unsupported.

Of course, we begin with the language of the Policy. During the regular-occupation period, the Policy provided that DuPerry was "[d]isabled"

if, solely because of Injury or Sickness, . . . she [wa]s:

1. unable to perform the material duties of . . . her Regular Occupation; and

2. unable to earn 80% or more of . . . her Indexed Earnings from working in . . . her Regular Occupation.

J.A. 58. DuPerry's case turned on the question of whether she was in fact unable to perform the material duties of her job. LINA makes no argument that even if DuPerry was unable to perform those duties, her inability was not "solely because of

Injury or Sickness."[5] Thus, it is the former issue on which we focus our discussion.

Initially, we note, as a global matter, that the pieces of evidence LINA identifies tend to show, first, that DuPerry was able to perform, for relatively brief periods, certain tasks involved in sedentary work and, second, that certain individual diseases and physical problems that afflicted her were not sufficient, in isolation, to render her unable to do such work. However, to perform her job, DuPerry obviously would be required to do much more than perform a small subset of her duties for a relatively short duration. Moreover, in so doing, she would have to overcome the combined effect of *all* of the problems caused by her diseases, not just a select few.

Now we will address the individual pieces of evidence that LINA has identified and "the degree to which they support" LINA's decision to deny benefits. *Booth*, 201 F.3d at 342. First, in a question on a form asking for "the maximum level of ability . . . of your patient to" lift, carry, push, and pull, Dr. Patel marked the choice "Sedentary = 10 lbs. maximum, walking occasionally." J.A. 797. While that answer certainly was some evidence of the fact that Dr. Patel believed that DuPerry could at times complete those individual tasks, as we have explained, that is a separate question altogether from whether she could perform the material duties of her job, which required many hours of work several days per week apart from these tasks. *See Stup*, 390 F.3d at 309 (explaining that even if two-and-a-half-hour functional capacity examination "had shown conclusively that [the claimant] could perform sedentary tasks for the duration of the test," the results would "provide no evidence as to [the claimant's] abilities for a longer period"). Dr. Patel left no doubt regarding the latter question as he wrote on that very form that DuPerry could

---

[5]Nor does LINA argue that even if she was unable to perform her regular occupation, she could earn at least 80% of her indexed earnings.

"[n]ever" return to work because she was "[p]ermanently disabled." J.A. 797.

For similar reasons, Dr. Harris's checking "[o]ccasionally" in a number of blocks on a Physical Ability Assessment Form concerning how often DuPerry could perform certain tasks such as sitting, standing, and walking did not conflict with his opinion that she could not return to work. J.A. 768. Aside from the fact that performing these individual tasks comprised only a small part of DuPerry's workday, it is noteworthy that the form defined "[o]ccasionally" alternatively as *1% to 33% of an eight-hour day or less than 2.5 hours*.[6] J.A. 768.

The physical therapist's note that DuPerry had made "small strength and endurance gains" obviously also falls well short of creating a conflict with DuPerry's doctors' opinions for the same reason. J.A. 813. That DuPerry made small gains in no way calls into question DuPerry's doctors' opinions that she still was not able to return to work. Nor does the physical therapist's note stating that she was able to complete ten laps around a 170-foot track in nine minutes create such a conflict. Aside from the fact that this pace is only slightly more than two miles per hour, the test lasted only nine minutes. It could hardly be found to be instructive on the question of whether DuPerry could endure the rigors of a full workday or workweek. The same can be said of LINA's citation to DuPerry's "excellent compliance" with her strength and conditioning exercises, which indicates only that DuPerry was giving her best effort. J.A. 813.

Dr. Patel's telephone message of November 3, 2006, also creates no conflict. According to that message, Dr. Patel reported:

> [DuPerry] unable to work [due to] Fibromyalgia, fatigue as well as side effects of pain meds – these

---

[6]1% of an eight-hour workday is less than five minutes.

are what is limiting [DuPerry], symptoms overall w/ achiness and stiffness w/ weather changes, no other major complaints at this time, to continue on meds- having good response so far – has not called w/ com- plaints, have not se[e]n since Sept – Rheumatoid arthritis is controlled at this point in time – [DuPerry] not able to work [due to] pain and fatigu[ ]e as well as pain med side effects.

J.A. 898. LINA focuses on the part of the message stating that DuPerry's arthritis is under control, but it is hard to see how that matters much in light of Dr. Patel's statement that her pain, fatigue, and side effects from her medications were pre- venting her from working.

Similarly, Dr. Patel's January 12, 2007, letter does not undercut his opinion that DuPerry was disabled. The letter reported:

[DuPerry's] arthritis is moderately active and has been reasonably well controlled with the medications she is on . . . . However, her fibromyalgia and fatigue symptoms are secondary to her underlying disease process and are all managed with the medications. It makes it difficult for her to function and return back to previous work duties. At this time, she certainly has some limitations requiring a hospital bed at home to sleep comfortably on. She has trouble get- ting up and around, although the pain is reasonably well controlled with the pain medications. At this time, because of the above medical problems and complications thereof and medications, she certainly is not able to return to any previous work duties.

J.A. 518. Again, the fact that her arthritis was under control and that her pain may have been well controlled with pain medications does not conflict at all with Dr. Patel's view that the combination of DuPerry's pain, fatigue, and the effects of

her medication prevented her from engaging in gainful employment.

As for Dr. McCool's note that DuPerry's blood test results showed her "hematocrit and hemoglobin around 11/32," J.A. 874, LINA does not explain how this advances its cause. LINA maintains, without explanation, that this note indicates that the results "contradicted [DuPerry's] subjective complaints of fatigue." Brief of Appellant at 12. DuPerry, however, argues that low scores on these blood tests are indicative of anemia and that DuPerry did not claim to be suffering from anemia, which is not a by-product of arthritis or fibromyalgia. *See* MedicineNet.com, *http://www.medicinenet.com/ hematocrit/article.htm* (last visited Dec. 16, 2010); Medicine-Net.com, *http://www.medicinenet.com/hemoglobin/page2.htm* (last visited Dec. 16, 2010). LINA does not explain how these blood tests conflict with DuPerry's claim that she is disabled.

In short, LINA has not satisfactorily explained how any of the first six pieces of evidence it identifies creates any significant reason to doubt the correctness of the opinions offered by Drs. Patel and Harris that "solely because of Injury or Sickness," DuPerry was "unable to perform the material duties of . . . her Regular Occupation." J.A. 124 (Policy). That leaves LINA only with Dr. Levesque's reports, to which we now turn.

Dr. Levesque acknowledged in both reports that DuPerry suffers from rheumatoid arthritis and fibromyalgia, but he found no reason for concluding that either disease prevented DuPerry from being able to work. In his January 31, 2008, report, he stated that while "[t]he records amply document" DuPerry's "problems with chronic pain and fibromyalgia . . . *given the absence of physical limitations* due to [fibromyalgia], there is nothing that would preclude [DuPerry] normally from pursuing a typical sedentary occupation." J.A. 174 (emphasis added). He added that "[g]enerally, patients with fibromyalgia are able to work a sedentary occupation." J.A.

174. In his February 10, 2008, report Dr. Levesque further acknowledged that fibromyalgia is the "underlying major diagnosis for [DuPerry's] pain" but stated that "*given the lack of physical findings associated with the diagnosis*, it does not adequately support the limitations imposed" on DuPerry's ability to work by her treating physicians. J.A. 144 (emphasis added).

Dr. Levesque's reasoning is cryptic, to be sure, and it is not for us to second-guess LINA's reading of the reports to the extent it was reasonable. Nevertheless, we agree with the district court that under *any* permissible reading, the reports do not provide a reasonable basis for denial of DuPerry's claim. We will address the possible meanings of the reports seriatim.

First, it is possible that Dr. Levesque simply concluded that DuPerry did not produce the *type* of evidence that would show that the pain and fatigue caused by her fibromyalgia and other conditions was so substantial that she could not perform the material duties of her job. However, DuPerry produced the only types of evidence a claimant in her situation could produce, her own description of the severity of her subjective symptoms, videos showing how she moved in her condition, and her treating physicians' opinions that the pain and fatigue rendered her unable to work. As the Policy contained no provision precluding DuPerry from relying on her subjective complaints as part of her evidence of disability, LINA could not reasonably deny her claim because of such reliance. *Cf. Smith v. Continental Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004) (discussing plan stating that limited benefits would be provided for a disability "due to a diagnosed condition which manifests itself primarily with *Self-Reported Symptom(s)*").

Second, it is possible that Dr. Levesque simply was not persuaded that DuPerry was rendered unable to work by the pain and fatigue she experienced from her fibromyalgia and her other conditions. If that was Dr. Levesque's opinion, we cannot conclude that the opinion was "deliberate" or "principled."

Although Dr. Levesque did not examine DuPerry, he noted that review of her videos indicated that her rheumatoid arthritis was sufficiently controlled that it would not prevent her from working. However, he did not report seeing anything in the videos that would cause him to doubt her claim and those of her treating doctors that her pain and fatigue from her fibromyalgia and her other conditions prevented her from enduring the rigors of the workweek. Dr. Levesque, of course, noted that "*[g]enerally*, patients with fibromyalgia are able to work a sedentary occupation." J.A. 174 (emphasis added). However, even if fibromyalgia were the only condition afflicting DuPerry, Dr. Levesque's observation would be insufficient to create any conflict with DuPerry's claim absent evidence that DuPerry's symptoms were no worse than average in severity. And, of course, fibromyalgia was not DuPerry's only condition.

Considering all of the evidence together, we simply see no reasonable basis in the record for LINA's denial of DuPerry's claim. It is undisputed that DuPerry suffers from chronic diseases that are potentially debilitating. She has presented substantial evidence from her physicians that these diseases do, in fact, prevent her from working. And, she has presented her own declaration and declarations from her family and even her former employer confirming the severity of her symptoms. The only evidence of any consequence that LINA can point to as conflicting with DuPerry's entitlement to benefits are the reports of Dr. Levesque. However, these reports contain no significant basis supporting a conclusion that the symptoms from DuPerry's fibromyalgia, either by themselves or combined with the symptoms from her other conditions, are not sufficiently severe as to prevent her from enduring the rigors of her workweek. Especially in light of the structural conflict present here by virtue of LINA's dual role as insurer and administrator of the plan, we conclude that LINA's denial of DuPerry's claim was unreasonable and an abuse of its discretion. *Cf. Stup*, 390 F.3d at 308 (explaining in pre-*Glenn* case applying modified-abuse-of-discretion standard that

"while an administrator does not necessarily abuse its discretion by resolving an evidentiary conflict to its advantage, the conflicting evidence on which the administrator relies in denying coverage must be 'substantial'—especially when, as in this case, the administrator has an economic incentive to deny benefits").

### III.

LINA next contends that the district court erred in importing a Social Security Disability Income rule into the ERISA arena. Of course, we have decided *de novo* that LINA abused its discretion in denying DuPerry's claim. Nevertheless, to the extent that LINA's argument would apply to our analysis as well, we will address it.

LINA notes that the district court reasoned:

> [W]here an ERISA plan does not provide procedures for dealing with subjective complaints of pain and a claimant puts forth objective evidence of a disease that could cause her subjective complaints of pain, it seems that a principled reasoning process necessarily requires the administrator to address the claimant's subjective complaints of pain in a thorough, meaningful way if the administrator is to deny the claim.

J.A. 1009-10. LINA maintains that that rule is at odds with our decision in *Smith*, in which we rejected a similar rule. We disagree.

In *Smith*, the district court, rather than applying the language in the plan under which the plaintiff claimed benefits, imported the Social Security Act ("SSA") rule that

> [o]nce an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence,

such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.

*Smith*, 369 F.3d at 418 (internal quotation marks omitted). We reversed and remanded to the district court, holding that the language of the plan controls even if applying the plan terms would produce a different result than would be produced by the SSA rules. *See id.* at 419-20. The critical difference in the present case is that although the district court in the case at bar applied a rule similar to that applied by the district court in *Smith*, the district court in the case at bar derived that rule from a common-sense interpretation of the plan language rather than by importing the rule from SSA. In fact, the district court in this case specifically acknowledged that SSA rules would not necessarily apply.

LINA maintains that under the rule the district court applied, LINA was essentially required to award benefits simply based on DuPerry's subjective complaints. But that is not the case at all. As the district court explained, LINA was not required to "simply accept [DuPerry's] subjective complaints of pain without question," but neither could LINA "simply dismiss such subjective complaints of pain out of hand, especially where there is objective medical proof of a disease that could cause such pain." J.A. 1009. Neither LINA nor Dr. Levesque gave any principled reason for rejecting DuPerry's claim that her symptoms prevented her from returning to work, and in fact none exists in the record. The mere fact that Dr. Levesque offered the conclusion that DuPerry had not adequately supported her claim that she could not return to work was not sufficient to support the benefits denial, especially considering LINA's conflict of interest.

LINA also argues that the district court's "rule would vitiate years of ERISA case law upholding plan administrators' interpretations of their plans to require more than just subjec-

tive complaints to support a claim for benefits." Brief of Appellant at 37. Even assuming, however, that subjective complaints cannot be sufficient, by themselves, to support a disability benefits claim, that is not the case we have here because DuPerry's subjective complaints were only part of the evidence of her condition. The existence of objective evidence that DuPerry suffered from rheumatoid arthritis, osteoarthritis, and fibromyalgia is not disputed. That a person with these diseases would suffer significant pain and fatigue is also well established. DuPerry's subjective complaints served only to pinpoint the precise intensity of her symptoms and her inability to endure them over the course of a workweek. In the absence of any significant basis for rejecting the account of DuPerry and her treating physicians and in light of the structural conflict of interest that LINA faced as the result of its dual role as administrator and insurer, LINA's denial of benefits constituted an abuse of discretion.

## IV.

Having determined that LINA abused its discretion in denying DuPerry's benefits claim, we next must determine what remedy to apply.

As noted earlier, "[d]isabled" is defined in two different ways in the Policy. First, during the regular-occupation period, a participant is disabled if, because of injury or sickness, she is "unable to perform the material duties of . . . her Regular Occupation" and "unable to earn 80% or more of . . . her Indexed Earnings." J.A. 58. This is the definition that was applicable to DuPerry's claim when LINA denied it. However, once Disability Benefits have been payable for 24 months, the "any-occupation" period begins and a participant is considered to be disabled only if, because of injury or sickness, she is "unable to perform the material duties of any occupation" and is "unable to earn 60% or more of . . . her Indexed Earnings." J.A. 58. DuPerry's any-occupation period of disability began on or about October 5, 2008.

LINA notes that it has not received evidence regarding, nor made any determination of, DuPerry's right to any-occupation disability benefits. LINA contends that the record thus is not sufficient to support an analysis of whether DuPerry was entitled to such benefits because, among other things, "there is no evidence as to the universe of occupations for which DuPerry would be eligible. Nor is there any evidence as to the potential earnings DuPerry could realize from these occupations." Brief of Appellant at 53-54. We conclude, however, the district court acted correctly.

It is true that generally a claimant must exhaust the administrative remedies provided in an employee benefit plan before prosecuting an ERISA claim in federal court. *See Hickey v. Digital Equip. Corp.*, 43 F.3d 941, 945 (4th Cir. 1995). However, a "clear and positive" showing that such exhaustion would be futile will circumvent this requirement. *Makar v. Health Care Corp. of Mid-Atlantic (CareFirst)*, 872 F.2d 80, 83 (4th Cir. 1989) (internal quotation marks omitted). We review for abuse of discretion a district court's decision regarding whether to remand an ERISA benefits claim for exhaustion of administrative remedies. *See Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1200 (11th Cir.), *vacated in part on other grounds*, 506 F.3d 1316, 1317 (11th Cir. 2007) (per curiam); *Dozier v. Sun Life Assurance Co. of Canada*, 466 F.3d 532, 534 (6th Cir. 2006); *Hickey*, 43 F.3d at 945.

In this case, DuPerry can hardly be blamed for not applying to LINA for benefits during the any-occupation period as LINA, having denied DuPerry's claim under the regular-occupation standard, would have surely denied a claim under the any-occupation standard as well. *See Dozier*, 466 F.3d at 535. And, while LINA has not yet passed on the question of whether DuPerry could satisfy the any-occupation standard, in this case there is no indication that the change in standard would affect the result. Specifically, it is apparent from the record that DuPerry's inability to work was not the result of particular duties specific to her regular occupation. Dr. Patel

indicated that DuPerry was "[p]ermanently disabled" and that she could "[n]ever" return to work. J.A. 797. As her dosage of pain medication continued to increase, he reported that DuPerry "need[ed] to limit her activities" such that if she did "five to ten minutes of work," she needed to "rest[ ] for 30 to 40 minutes before returning . . . to work duties." J.A. 229. Dr. Harris stated that he informed DuPerry in May 2005 "that she needed to stop work," but that she continued working until February 6, 2006, when she simply could not control her increasing pain. J.A. 462. As of November 27, 2006, Harris opined that DuPerry was "unable to continue any gainful employment." J.A. 462. As we have explained, there was no principled basis in the record to reject these doctors' opinions. Thus, we believe this is one of those rare cases where a remand to the plan administrator would serve no purpose. Under the circumstances of this case, we hold that the district court was within its discretion in awarding DuPerry benefits up to the date of its decision in lieu of remanding to LINA. *See Oliver*, 497 F.3d at 1200 (affirming district court decision that because remand to plan administrator would have been futile, claimant was entitled to benefits during any-occupation period as well as during regular-occupation period even though claimant had applied for benefits during regular-occupation period); *Dozier*, 466 F.3d at 535-37 (in case in which district court granted judgment to claimant based on satisfaction of regular-occupation standard of disability, reversing district court's dismissal of claim for benefits made under any-occupation standard of disability when remand to administrator would have been futile).

V.

Finally, LINA contends that the district court abused its discretion in awarding attorneys' fees to DuPerry. *See Carolina Care Plan, Inc. v. McKenzie*, 467 F.3d 383, 390 (4th Cir. 2006) (standard of review). We disagree.

We have adopted a five-factor test to guide courts' discretion in determining whether an attorneys' fee award is warranted under ERISA. The five factors are:

> (1) degree of opposing parties' culpability or bad faith;

> (2) ability of opposing parties to satisfy an award of attorneys' fees;

> (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

> (5) the relative merits of the parties' positions.

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993).

The district court concluded that on balance these factors weighed in favor of a fee award. Regarding the first and fifth factors, the court noted that while LINA's "conduct may not rise to the level of bad faith, [LINA] certainly demonstrates some degree of culpability in its dismissal of [DuPerry's] subjective complaints without meaningful inquiry." J.A. 1047. The court noted that LINA "patently abused the claim review procedure" by "overlook[ing] substantial evidence from [DuPerry's] treating physicians that she was unable to work" and relying instead "on minor inconsistencies in and disingenuous interpretations of these physicians' reports." J.A. 1047. The court also found that "awarding attorneys' fees may produce a deterrent effect by encouraging plan administrators to

inquire more meaningfully into disability claims that rely on subjective complaints of pain." J.A. 1047.

In our view, the district court analyzed the *Quesinberry* factors reasonably, and we find that the decision to award attorneys' fees did not constitute an abuse of discretion.

## VI.

In sum, we find no error in the district court's resolution of the questions before it. We therefore affirm.

*AFFIRMED*